UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

**BRIAN TORRES, SR.,**

     **Petitioner,**

**v.**                                **Case No. 8:16-cv-2973-MSS-TGW**

**SECRETARY, DEPARTMENT
OF CORRECTIONS,**

     **Respondent.**

_____/

**O R D E R**

Torres filed a petition for a writ of habeas corpus under 28 U.S.C. § 2254 challenging his state court convictions for sexual battery on a child, sexual activity with a child, and lewd and lascivious molestation. After reviewing the petition (Doc. 1), the response (Doc. 10), the reply (Doc. 15), the supplemental briefs (Docs. 33 and 34), and the relevant state court record, the Court **DENIES** the petition.

**PROCEDURAL HISTORY**

A jury found Torres guilty of sexual battery on a child, two counts of sexual activity with a child, and three counts of lewd and lascivious molestation. (Respondent's Exhibit 1 at 292–97, 306) The trial judge sentenced Torres to life in prison for the sexual battery on a child conviction, fifteen years in prison for convictions for sexual activity with a child, twenty-five years in prison for one of the

lewd and lascivious molestation convictions, and ten years in prison for the remaining two lewd and lascivious molestation convictions. (Respondent's Exhibit 1 at 310–16)

Torres appealed, and the state appellate court affirmed his convictions and sentences. (Respondent's Exhibit 4) Torres filed a motion for post-conviction relief (Respondent's Exhibit 7), the post-conviction court denied relief (Respondent's Exhibit 8), and the state appellate court affirmed. (Respondent's Exhibit 10) Torres's federal petition followed.

## FACTS

Torres lived in Zephyrhills, Florida, with his girlfriend, his girlfriend's two daughters, C.P.H. and C.L.H., his biological daughter, C.M.T., and his son. (Trial Transcript at 254–55, 289, 326)

A second amended information charged Torres with committing a sexual battery on C.P.H. and engaging in sexual activity with C.L.H. and C.M.T. by placing his finger in each victim's vagina. (Respondent's Exhibit 1 at 228–29) The information further charged Torres with committing a lewd and lascivious molestation of C.P.H., C.L.H., and C.M.T. by touching their breasts and genitals. (Respondent's Exhibit 1 at 229–30) The following evidence was presented at trial.

### C.L.H.

C.L.H., who was nineteen at the time of trial in 2012, testified that, between 1998 and 2006, Torres touched her vagina and her breasts when her mother left for work. (Trial Transcript at 253, 256–57) She testified that Torres placed his finger inside her vagina twice and asked her to touch his penis a couple of times. (*Id.* at 256–57) She

2

testified that sometimes Torres gave her a blue pill that caused her to feel drowsy and sick the following morning. (*Id.* at 257) She testified that Torres told her, "Don't say anything or it could break up the family," and that she would "get in a lot of trouble if [she] told anyone." (*Id.* at 258, 267) She did not tell anyone because she wanted her younger brother to remain with Torres, his father. (*Id.* at 258) She testified that C.P.H. and C.M.T. confided that Torres sexually abused them too. (*Id.* at 258–59) She testified that, in 2006, she told her aunt about the abuse and that her aunt told her mother who initially responded in disbelief. (*Id.* at 259–60, 266) She testified that her mother later reported the abuse to police. (*Id.* at 260)

A pediatric nurse practitioner testified that he interviewed and examined C.L.H. after her mother reported the sexual abuse to police. (Trial Transcript at 358–59) The nurse practitioner testified that, during the interview, C.L.H. stated that at night, Torres touched her "private parts" and "inside her body." (*Id.* at 359) C.L.H., who was thirteen at the time of the interview, further stated that the abuse started when she was six and continued until about a month before the interview. (*Id.* at 253, 358–59) C.L.H. stated that Torres had asked her to touch his "private spots" with his hand. (*Id.* at 359) During a physical examination of C.L.H., the nurse practitioner did not observe any abnormality that indicated sexual abuse. (*Id.* at 360)

### C.M.T.

C.M.T., who was eighteen at the time of trial in 2012, testified that Torres sexually abused her between 1998 and 2006. (Trial Transcript at 288–90) She testified

that the abuse first started when she was six, after she attended her younger brother's birthday party at a pizza restaurant. (*Id.* at 290) She testified that she and C.L.H. shared a room with a bunk bed and that Torres entered the room and touched them underneath their clothes on the vagina. (*Id.* at 291) She denied that Torres touched her breasts, penetrated her vagina with his finger, or "place[d] his finger inside of [her] vagina." (*Id.* at 291–92, 298) However, she testified that Torres "stuck his finger in [her] private" and "started playing with [her]." (*Id.* at 299, 318)

C.M.T. testified that, while she and C.P.H. slept on a couch and shared a blanket, Torres placed his hand under the blanket, touched C.P.H., and quickly left the room when C.M.T. woke up. (Trial Transcript at 292) She testified that Torres sexually abused her once or twice a week and only at night while her mother slept. (*Id.* at 293–94, 314) She testified that she and C.L.H. spoke about the abuse, but they never told anyone. (*Id.* at 294) She testified that, when she learned that Torres abused C.P.H., she and C.L.H. agreed that C.P.H. should tell their aunt. (*Id.* at 294–95) She testified that Torres told her that "if [she] ever [told] anybody, bad things would come to [her] family." (*Id.* at 294) She testified that sometimes Torres gave her a blue pill and a gray pill and told her that the pills prevented illness. (*Id.* at 294–95)

On cross-examination, C.M.T. testified that, when she, C.L.H., and C.P.H. first told their aunt and their mother about the sexual abuse, their mother did not believe them and punished them by prohibiting them from leaving their room. (Trial Transcript at 301) She testified that, during a recording set up by their mother, she and her sisters did not want to talk about the abuse because they knew what happened and

that they started laughing because C.P.H. "started playing with something." (*Id.* at 304) She testified that her mother threatened to send her and her sisters to a boot camp if they did not apologize and admit that they were lying. (*Id.* at 304) She testified that she initially refused but later admitted to her mother that no abuse occurred. (*Id.* at 304) She testified that her mother required that she, C.L.H., and C.P.H. apologize to Torres. (*Id.* at 305–06) She testified that her mother had removed Torres from the home for a few days but asked him to return. (*Id.* at 306)

C.M.T. testified that, after Torres returned to the home, Torres did not abuse her and her sisters because her mother started sleeping on the couch in the living room. (Trial Transcript at 307–08) She testified that her mother took her and her sisters out of the home and asked them to truthfully tell her whether the abuse had occurred. (*Id.* at 308) She testified that, after she and her sisters told their mother that the abuse had occurred, her mother reported the abuse to police. (*Id.* at 308)

The pediatric nurse practitioner testified that, during an interview, C.M.T., who was twelve at the time of the interview, tearfully stated that Torres entered her bedroom where she and her sister slept, placed one hand down her pants, and placed another hand over her mouth to prevent her from screaming. (Trial Transcript at 358, 364) C.M.T. stated that the sexual abuse occurred for two or three years and denied that any penetration had occurred. (*Id.* at 364–65) During trial, she admitted that she did not understand the difference between "rubbing" and "penetration." (*Id.* at 313)

5

**C.P.H.**

C.P.H., who was fifteen at the time of trial in 2012, testified that, between 1998 and 2006, Torres inappropriately touched her vagina in her bedroom at night. (Trial Transcript at 325–26, 331) She testified that at least twice Torres came into her bedroom and placed his finger inside her vagina. (*Id.* at 327) She testified that the sexual abuse usually occurred after Torres fought with her mother. (*Id.* at 330–31) She testified that she was afraid to tell her mother about the abuse and that she first told her sisters when they asked if Torres abused her. (*Id.* at 327–28) She testified that Torres gave her blue pills that caused her to feel drowsy and tired. (*Id.* at 328) She testified that she never told Torres to stop abusing her because she felt scared. (*Id.* at 328) She testified that, after she told her sisters about the abuse, her sisters told their aunt, and their aunt told their mother. (*Id.* at 328) She testified that her mother thought that she and her sisters were lying about the abuse but eventually believed them and reported the abuse to police. (*Id.* at 328–29)

On cross-examination, C.P.H. testified that, after learning about the abuse, her mother instructed C.P.H. and her sisters to talk about the abuse in their bedroom. (Trial Transcript at 336) She testified that she and her sisters tried to talk about the abuse, but she did not want to talk about the abuse because at the time she believed that Torres was her biological father. (*Id.* at 336–37) She denied that she and her sisters laughed or stated that no abuse had occurred. (*Id.* at 337) She denied that her mother required that she and her sisters apologize to Torres and testified that her mother only

prohibited them from leaving their room because her mother thought that they were lying about the abuse. (*Id.* at 337–38) She admitted that she initially denied to police officers that Torres penetrated her vagina. (*Id.* at 338) Only a few months before trial, she first claimed that Torres had penetrated her vagina. (*Id.* at 338) She testified that earlier she did not know what the word "penetration" meant. (*Id.* at 343)

The pediatric nurse practitioner testified that, during an interview, C.P.H., who was nine at the time of the interview, stated that every time that Torres and her mother fought, Torres slept on the couch, came into her room in the middle of the night, and touched her "private parts" with his fingers and "went inside her body." (Trial Transcript at 364) During a physical examination of C.P.H., the nurse practitioner did not observe any abnormality that indicated abuse. (*Id.* at 364)

The pediatric nurse practitioner testified that he generally would not observe any abnormality from touching or digital penetration of the vagina. (Trial Transcript at 360–61, 363) Also, he testified that none of the victims told him that Torres either touched their breasts or gave them pills. (*Id.* at 367, 374)

### Erika Valentin

Erika Valentin[1], who was Torres's sister, testified that C.L.H., C.M.T., and C.P.H. told her that Torres sexually abused them. (Trial Transcript at 384) She testified that she told the girls' mother about the abuse and that the victim's mother contacted

---

[1] Before Valentin testified, the trial judge instructed that the jury should consider her testimony only "for the limited purpose of proving motive, opportunity, intent, preparation, plan, knowledge, identity, the absence of mistake or accident" by Torres. (Trial Transcript at 380)

police. (*Id.* at 384) She testified that, when she was thirteen or fourteen and living with her mother, she accused her two brothers, Mark and Augustine, of sexual abuse and that Mark was convicted of a crime. (*Id.* at 385) She testified her mother insisted that she leave the home when she accused her stepfather of sexual abuse. (*Id.* at 386) She testified that she moved to live with Torres and his girlfriend. (*Id.* at 386) She testified that, a few years later when she was in high school, Torres touched her vagina with his fingers and his mouth. (*Id.* at 387) She testified that she never reported the abuse because she felt scared and embarrassed. (*Id.* at 387–88)

On cross-examination, Valentin denied that she ever told Torres to stop or to leave her alone and admitted that she only first disclosed the sexual abuse when C.L.H., C.M.T., and C.P.H. told her that Torres abused them. (Trial Transcript at 391–93) Also, after Valentin left Torres's home when she was eighteen, she returned to live with him several times, including once with her boyfriend and her young daughter. (*Id.* at 389–90, 393–94) Valentin did not disclose that Torres had sexually abused her when she first spoke with a police officer about the accusations by C.L.H., C.M.T., and C.P.H. and waited until Torres's criminal case had progressed to disclose the abuse. (*Id.* at 395–96) On cross-examination, Valentin testified that she had accused her stepfather of sexually abusing her, and a criminal conviction never arose from her accusation. (*Id.* at 418) After Valentin accused her stepfather of sexual abuse, Valentin's mother married her stepfather, and Valentin and her daughter moved to live with them. (*Id.* at 418)

**Torres**

Torres testified in his own defense. He denied that he sexually abused his daughter, his stepdaughters, and his sister. (Trial Transcript at 519–21, 568) He denied that he gave his daughter and his stepdaughters pills. (*Id.* at 567–68) He testified that, for eleven years, he lived with his girlfriend, his daughter, his stepdaughters, and his son. (*Id.* at 521) He testified that he allowed Valentin, his sister, to come live with him when she was about ten until she turned eighteen because a state agency wanted to place her in foster care. (*Id.* at 541, 558) He testified that he gained custody of his daughter because his daughter's mother was addicted to drugs. (*Id.* at 542)

Torres testified that he first learned about the accusations by his daughter and his stepdaughters when Valentin, his sister, told him. (Trial Transcript at 522) After learning about the accusations, he moved out of the home and spent the night at Valentin's home. (*Id.* at 522–23) Two days after Torres moved out, his girlfriend called and asked that he return home. (*Id.* at 523) When Torres returned, his daughter and his stepdaughters apologized to him and admitted that the accusations were false. (*Id.* at 524) Torres believed that his daughter and his stepdaughters accused him of the sexual abuse because he angered them by requiring them to complete chores. (*Id.* at 524–25)

Torres testified that he moved back into the home for a few months. (Trial Transcript at 525) When he learned that his girlfriend was dating his boss, he again moved out of the home. (*Id.* at 528, 534–35) When his girlfriend learned that he

9

was dating another woman, she reported the accusations of sexual abuse to police. (*Id.* at 534–35) He testified that a detective asked him voluntarily to come to the police station for an interview. (*Id.* at 535–36) At the police station, Torres became extremely upset when he learned that his girlfriend reported the accusations. (*Id.* at 536) After the interview, the detective allowed Torres to leave the police station and go home. (*Id.* at 538)

Torres testified that he was not at home during the day because he worked long hours at several jobs. (Trial Transcript at 545–49, 555–56) He testified that during the weekend he mostly slept and spent time with his son. (*Id.* at 550–51) He testified that, when he started to work as a commercial truck driver, his relationship with his girlfriend deteriorated because he was never home. (*Id.* at 553–54) He testified that he and his girlfriend were constantly fighting. (*Id.* at 554) He testified that, despite her accusations, his sister never forbade him from holding and playing games with her daughter. (*Id.* at 561–62)

## STANDARDS OF REVIEW

### AEDPA

Because Torres filed his federal petition after the enactment of the Antiterrorism and Effective Death Penalty Act, AEDPA governs his claims. *Lindh v. Murphy*, 521 U.S. 320, 327 (1997). AEDPA amended 28 U.S.C. § 2254(d) to require:

> An application for a writ of habeas corpus on behalf of a
> person in custody pursuant to the judgment of a State court
> shall not be granted with respect to any claim that was

10

adjudicated on the merits in State court proceedings unless the adjudication of the claim —

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

A decision is "contrary to" clearly established federal law "if the state court arrives at a conclusion opposite to that reached by [the United States Supreme Court] on a question of law or if the state court decides a case differently than [the United States Supreme Court] has on a set of materially indistinguishable facts." *Williams v. Taylor*, 529 U.S. 362, 413 (2000). A decision involves an unreasonable application of clearly established federal law "if the state court identifies the correct governing legal principle from [the United States Supreme Court's] decisions but unreasonably applies that principle to the facts of the prisoner's case." *Williams*, 529 U.S. at 413. Clearly established federal law refers to a holding of an opinion by the United States Supreme Court at the time of the relevant state court decision. *Williams*, 529 U.S. at 412.

"[AEDPA] modified a federal habeas court's role in reviewing state prisoner applications in order to prevent federal habeas 'retrials' and to ensure that state-court convictions are given effect to the extent possible under law." *Bell v. Cone*, 535 U.S. 685, 693 (2002). A federal petitioner must show that the state court's ruling was "so

11

lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility of fairminded disagreement." *Harrington v. Richter*, 562 U.S. 86, 103 (2011).

**Ineffective Assistance of Counsel**

Torres asserts ineffective assistance of counsel — a difficult claim to sustain. *Strickland v. Washington*, 466 U.S. 668, 687 (1984), requires a defendant to demonstrate both deficient performance and prejudice:

> First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

"[T]here is no reason for a court . . . to address both components of the inquiry if the defendant makes an insufficient showing on one." *Strickland*, 466 U.S. at 697. "[C]ounsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." *Strickland*, 466 U.S. at 690. "[A] court deciding an actual ineffectiveness claim must judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct." *Strickland*, 466 U.S. at 690.

"An error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment." *Strickland*, 466 U.S. at 691. To demonstrate prejudice, the defendant

must show "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. A reasonable probability is a "probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694.

*Strickland* cautions that "strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable." *Strickland*, 466 U.S. at 690. A defendant cannot meet his burden by showing that the avenue chosen by counsel was unsuccessful. *White v. Singletary*, 972 F.2d 1218, 1220–21 (11th Cir. 1992).

Because the standards under *Strickland* and AEDPA are both highly deferential, "when the two apply in tandem, review is 'doubly' so." *Richter*, 562 U.S. at 105. "Given the double deference due, it is a 'rare case in which an ineffective assistance of counsel claim that was denied on the merits in state court is found to merit relief in a federal habeas proceeding.'" *Nance v. Warden, Ga. Diag. Prison*, 922 F.3d 1298, 1303 (11th Cir. 2019) (citation omitted).

**Exhaustion and Procedural Default**

A petitioner must exhaust the remedies available in state court before a federal court can grant relief on habeas. 28 U.S.C. § 2254(b)(1)(A). The petitioner must (1) alert the state court to the federal nature of his claim and (2) give the state court one full opportunity to resolve the federal claim by invoking one complete round of the state's established appellate review process. *O'Sullivan v. Boerckel*, 526 U.S. 838, 845

(1999); *Picard v. Connor*, 404 U.S. 270, 278 (1971). The state court must have the first opportunity to review and correct any alleged violation of a federal right. *Baldwin v. Reese*, 541 U.S. 27, 29 (2004).

A federal court may stay a habeas case to allow a petitioner to return to state court to exhaust a claim. *Rhines v. Weber*, 544 U.S. 269 (2005); *Rose v. Lundy*, 455 U.S. 509 (1982). If the state court would deny the claim on a state procedural ground, the federal court denies the claim as procedurally defaulted. *Snowden v. Singletary*, 135 F.3d 732, 736 (11th Cir. 1998) (citing *Coleman v. Thompson*, 501 U.S. 722, 735 n.1 (1991)). Also, a petitioner's failure to comply with a state procedural rule governing the proper presentation of a claim bars review of that claim on federal habeas. *Coleman*, 501 U.S. at 729. "[A] state court's rejection of a federal constitutional claim on procedural grounds will only preclude federal review if the state procedural ruling rests upon [an] 'independent and adequate' state ground." *Judd v. Haley*, 250 F.3d 1308, 1313 (11th Cir. 2001).

To excuse a procedural default on federal habeas, a petitioner must demonstrate either (1) cause for the default and actual prejudice from the alleged violation of federal law or (2) a miscarriage of justice. *Maples v. Thomas*, 565 U.S. 266, 280 (2012); *House v. Bell*, 547 U.S. 518, 536–37 (2006).

ANALYSIS

**Ground One**

Torres asserts that the trial judge violated his federal right to due process by admitting the testimony by Erika Valentin, his sister, as evidence of other crimes, wrongs, or acts. (Doc. 1 at 6–7) Also, he asserts that the trial judge violated his federal right to confrontation by refusing to permit trial counsel to cross-examine and impeach Valentin with evidence that she falsely accused her stepfather of sexual abuse. (Doc. 1 at 6)

**Due Process Claim**

Torres asserts that the trial judge violated his federal right to due process by admitting the testimony by Valentin as evidence of other crimes, wrongs, or acts. (Doc. 1 at 6–7)

Before trial, the prosecutor timely notified trial counsel of his intent to introduce Torres's testimony as evidence of other crimes, wrongs, or acts. (Respondent's Exhibit 1 at 151–52) Trial counsel filed a motion to exclude the testimony. (Respondent's Exhibit 1 at 154–56)

The trial judge denied the motion to exclude the testimony as follows (Respondent's Exhibit 1 at 160–62):

> This matter came before this court on Defendant's motion in limine in response to State's notice of intent to use evidence of other crimes. Following an evidentiary hearing on this matter, and after considering the arguments of counsel, the motion and responses thereto, the record, and applicable law, this court finds as follows:

15

The defendant is charged by information with a total of five counts of felony sexual crimes against three different victims, two of whom were between the ages of twelve and sixteen at the time of the alleged offenses, and one which was less than twelve years of age.

The State filed two notices of intent to use evidence of other crimes, and the defendant filed his motion in limine in response [ ], and this order addresses, the latter one filed regarding the admissibility of testimony by defendant's sister, Erika Valentin.

After applying the criteria set forth in Florida Statutes Sections 90.404(2)(b) and 90.403, and in reliance on the ruling in *McLean v. State*, 934 So. 2d 1248 (Fla. 2006), this court makes the following findings as to the admissibility of the testimony of Erika Valentin regarding prior child molestation allegations against the defendant.

Following a lengthy evidentiary hearing at which defendant was present and during which Erika Valentin gave testimony, this court finds that Ms. Valentin's testimony was credible as to two of the incidences described and presented clear and convincing evidence that the prior offenses did occur. Only two of the three incidences described by Ms. Valentin were recounted with sufficient detail and memory to be considered. Those would be the two incidences that Ms. Valentin described as occurring in the bedroom; the first being on the bed and the second being up against a dresser. The third was described as occurring in the bathroom, and will not be admissible. In reaching this conclusion, this court carefully analyzed Ms. Valentin's testimony in accordance with standard considerations of [a] witness's testimony, and particularly noted that her demeanor appeared to be genuine and sincere.

The charged offense and the offense alleged by Ms. Valentin (hereinafter referred to as the "collateral offense") both occurred in the familial context, and the identity of the defendant is not at issue, and the collateral evidence is being offered to corroborate the victims' testimony in the charged offenses. As such, the admissibility of the

16

collateral offense testimony is subject to a relaxed "similarity" standard.

In determining that the offenses occurred in a familial setting, this court considered the following: when the collateral offense occurred, the victim was a child less than sixteen years of age and was in the custody of defendant, having been removed from her natural parent's custody as a result of prior abuse by other family members. The victims in the charged offense were also under the age of sixteen when the charged offense occurred, and one is the defendant's daughter and the other two are the daughters of defendant's former girlfriend, all of whom lived together with the defendant and his former girlfriend as a family.

In addition to the "familial setting" similarity, this court finds the following similarities between the charged offenses and the collateral offense. There were allegations of vaginal contact only. None of the allegations indicated any contact by defendant of kissing or touching any other body parts of victims. The collateral and the charged offenses all alleged defendant's digital contact with victims' vaginas, although the collateral testimony alleged defendant orally contacted victim's vagina in addition to the digital contact. All of the allegations occurred at the defendant's home while the defendant's girlfriend was either at work or asleep in another room. None of the allegations described any contact with defendant's penis by any victims. All of the victims were young females under the age of sixteen at the time of the offense. All of the victims indicated that defendant warned them not to tell anyone about the contact.

Because of the similarities enumerated [ ] above, this court finds that the collateral offense and the charged offense were substantially similar.

After carefully weighing the probative value of the collateral testimony versus the prejudicial effect, this court finds that the probative value substantially outweighs the danger of unfair prejudice.

> Therefore, it is ordered and adjudged that the testimony of Erika Valentin regarding the two incidences more particularly [described] herein shall be admissible for the purposes stated in this order, subject to all other rules of admissibility.

The trial judge determined that the similar fact evidence was admissible under state law, and a state court's determination of state law receives deference in federal court. *Machin v. Wainwright*, 758 F.2d 1431, 1433 (11th Cir. 1985) ("The federal courts must defer to a state court's interpretation of its own rules of evidence and procedure.").

"[I]t is not the province of a federal habeas court to reexamine state-court determinations on state-law questions." *Estelle v. McGuire*, 502 U.S. 62, 67 (1991). "[S]tate and federal statutes and rules ordinarily govern the admissibility of evidence, and juries are assigned the task of determining the reliability of the evidence presented at trial." *Perry v. New Hampshire*, 565 U.S. 228, 237 (2012). "Only when evidence 'is so extremely unfair that its admission violates fundamental conceptions of justice,' [has] [the U.S. Supreme Court] imposed a constraint tied to the Due Process Clause." *Perry*, 565 U.S. at 237 (quoting *Dowling v. United States*, 493 U.S. 342, 352 (1990)).

At the evidentiary hearing, Valentin testified that, when she was thirteen or fourteen, she lived with Torres and his girlfriend. (Respondent's Exhibit 1 at 176–77, 188) She testified that, while she was in Torres's bedroom on his bed, Torres placed his mouth on her vagina. (Respondent's Exhibit 1 at 181–83) Also, she testified that,

while she was in Torres's bedroom, Torres pushed her up against a dresser and touched her vagina over her clothes. (Respondent's Exhibit 1 at 184)

C.L.H., C.M.T., and C.P.H. testified that, in the middle of the night, Torres came into their room, touched their vaginas underneath their clothing, and placed his fingers inside their vaginas. (Respondent's Exhibit 1 at 74, 92–93, 114–15) C.L.H. and C.M.T. testified that the sexual abuse occurred many times until they were twelve or thirteen. (Respondent's Exhibit 1 at 71–73, 75, 77–78, 112, 114–15, 118) C.P.H. testified that the sexual abuse occurred about once a week until she was about ten. (Respondent's Exhibit 1 at 91–92, 94)

Because the sexual abuse of Valentin was sufficiently similar to the sexual abuse of C.L.H., C.M.T., and C.P.H. and was relevant to rebut Torres's defense of fabrication, the trial court did not unreasonably admit the similar fact evidence at trial. § 90.404(2)(b)(1), Fla. Stat. (2012) ("In a criminal case in which the defendant is charged with a crime involving child molestation, evidence of the defendant's commission of other crimes, wrongs, or acts of child molestation is admissible and may be considered for its bearing on any matter to which it is relevant."). *State v. Tameris*, 54 So. 3d 619, 620 (Fla. 5th DCA 2011) ("'[T]he similar fact evidence was relevant to corroborate the victim's testimony and rebut [a] claim of fabrication. Admitting similar fact evidence for this purpose has been addressed by a number of courts . . . .'") (quoting *Bruce v. State*, 44 So. 3d 1225, 1229 (Fla. 5th DCA 2010)).

The trial judge reasonably determined that the probative value of the similar fact evidence substantially outweighed the danger of unfair prejudice. Before Valentin testified at trial, the trial court read the following limiting instruction to the jury (Trial Transcript at 380, 382):

> [Trial judge:]    Ladies and gentlemen, the evidence you are about to receive concerning evidence of other crimes, wrongs, or acts allegedly committed by the Defendant, will be considered by you for the limited purpose of proving motive, opportunity, intent, preparation, plan, knowledge, identity, the absence of mistake or accident, any of those, on the part of the Defendant. And you shall consider it only as it relates to those issues.
>
> . . .
>
> [T]he Defendant is not on trial for a crime, wrong, or act that is not included in the information.

A jury is presumed to follow a limiting instruction. *Samia v. United States*, 599 U.S. 635, 646 (2023) ("Evidence at trial is often admitted for a limited purpose, accompanied by a limiting instruction. And, our legal system presumes that jurors will 'attend closely the particular language of [such] instructions in a criminal case and strive to understand, make sense of, and follow' them.") (citation omitted).

During closing, the prosecutor did not argue that the sexual abuse of Valentin proved that Torres had the propensity to commit the crimes against C.L.H., C.M.T., and C.P.H. (Trial Transcript at 649–50, 668) Because admission of the testimony by

Valentin did not render Torres's trial fundamentally unfair, the state court did not unreasonably deny the federal due process claim. *Thigpen v. Thigpen*, 926 F.2d 1003, 1019 (11th Cir. 1991).

The federal due process claim is **DENIED**.

**Confrontation Clause Claim**

Torres asserts that the trial judge violated his federal right to confrontation by prohibiting trial counsel from cross-examining and impeaching Valentin with evidence that she falsely accused her stepfather of sexual abuse. (Doc. 1 at 6)

"The Sixth Amendment to the Constitution guarantees the right of an accused in a criminal prosecution 'to be confronted with the witnesses against him.'" *Davis v. Alaska*, 415 U.S. 308, 315 (1974). "'[T]he main and essential purpose of confrontation is to secure for the opponent the opportunity of cross-examination.'" *Davis*, 415 U.S. at 315–16 (citation omitted). "[A] criminal defendant states a violation of the Confrontation Clause by showing that he was prohibited from engaging in otherwise appropriate cross-examination designed to show a prototypical form of bias on the part of the witness, and thereby 'to expose to the jury the facts from which jurors . . . could appropriately draw inferences relating to the reliability of the witness.'" *Delaware v. Van Arsdall*, 475 U.S. 673, 680 (1986) (quoting *Davis*, 415 U.S. at 318).

"It does not follow, of course, that the Confrontation Clause of the Sixth Amendment prevents a trial judge from imposing any limits on defense counsel's inquiry into the potential bias of a prosecution witness." *Van Arsdall*, 475 U.S. at 679.

21

"On the contrary, trial judges retain wide latitude insofar as the Confrontation Clause is concerned to impose reasonable limits on such cross-examination based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness's safety, or interrogation that is repetitive or only marginally relevant." *Van Arsdall*, 475 U.S. at 679.

At trial, the trial judge did not prohibit trial counsel from cross-examining Valentin about her accusation of sexual abuse against her stepfather. During direct examination, Valentin testified that she accused her brothers, Mark and Augustine, of sexual abuse, that Mark was charged and convicted of a crime, and that she did not know if Augustine was charged and convicted of a crime. (Trial Transcript at 385–86) The trial judge determined that this testimony elicited by the prosecutor improperly bolstered Valentin's testimony and opened the door to cross-examination of Valentin about her accusation of sexual abuse against her stepfather. (*Id.* at 410–15)

Trial counsel proceeded to cross-examine Valentin about her accusation against her stepfather as follows (Trial Transcript at 417–18):

> [Trial counsel:]  Ms. Valentin, at some point in time, you made some allegations of some sexual misconduct or improprieties against your stepfather, Podgie Acevedo, also?
>
> [Valentin:]  Yes.
>
> [Trial counsel:]  And Podgie is married to your mother, Ruth Torres.

| | |
|---|---|
| [Valentin:] | Now she is, yes. |
| [Trial counsel:] | Did those allegations ever result in a conviction? |
| [Valentin:] | No. |
| [Trial counsel:] | After you made the allegations against Podgie Acevedo, did you move back into the house with Podgie Acevedo and your mother, Ruth Torres? |
| [Valentin:] | Yes. |
| [Trial counsel:] | How many times? |
| [Valentin:] | I don't know. |
| [Trial counsel:] | More than once? |
| [Valentin:] | I don't know. |
| [Trial counsel:] | And did you have your daughter with you? |
| [Valentin:] | Yes. |

The trial judge prohibited trial counsel from asking Valentin whether she told her mother that her accusation against her stepfather was false. (Trial Transcript at 411) During a proffer, trial counsel asked Valentin about the recantation to her mother, and Valentin testified that she did not remember the recantation and would not have recanted the accusation because her accusation was truthful. (*Id.* at 416–17)

Trial counsel confronted Valentin with her accusation against her stepfather and challenged the truthfulness of the accusation by demonstrating that the accusation never resulted in a conviction, that her mother married her stepfather after

the accusation, and that Valentin and her daughter lived with her mother and her stepfather even after the accusation. During the proffer, Valentin testified that she did not remember the recantation and denied that she would have recanted the accusation. Consequently, the jury would not have received a significantly different impression of her credibility if trial counsel further cross-examined her on the recantation.

Because the trial judge reasonably limited the cross-examination, the state court did not unreasonably deny Torres's claim based on the Confrontation Clause. *Al-Amin v. Warden Ga. Dep't Corrs.*, 932 F.3d 1291, 1303 (11th Cir. 2019) ("Importantly, the trial court otherwise permitted cross-examination of Agent Campbell, and the prohibition on cross-examining Agent Campbell about these particular allegations did not prevent Al-Amin from making his general defense that the weapons were planted."); *Erwin v. Sec'y, Fla. Dep't Corrs.*, 568 F. App'x 749, 752–53 (11th Cir. 2014)[2] ("Erwin was able to elicit testimony from R.D.S. showing her bias or motive to fabricate, and therefore was able to sufficiently call into question her credibility. The jury would not have received a significantly different impression of R.D.S.'s credibility by allowing testimony that she had previously been told by a judge that future inappropriate sexual conduct could result in arrest.") (citing *Van Arsdall*, 475 U.S. at 680).

---

[2] 11th Cir. R. 36-2 ("Unpublished opinions are not considered binding precedent, but they may be cited as persuasive authority.").

Before trial, the trial judge granted the prosecutor's motion to exclude testimony by Valentin's mother that Valentin admitted that her accusation against her stepfather was false. (Trial Transcript at 29–37) Under Florida law, evidence of a false accusation of sexual abuse against a person who is not the defendant is not admissible. *Pantoja v. State*, 59 So. 3d 1092, 1096–98 (Fla. 2011). After Valentin testified, the trial judge denied trial counsel's motion to reconsider the ruling. (Trial Transcript at 502–05) Despite the exclusion under Florida law, evidence of a false accusation of sexual abuse against person who is not the defendant may be admissible under the Confrontation Clause. *Pantoja*, 59 So. 3d at 1098–99.

During a proffer, Valentin's mother testified that Valentin admitted that she falsely accused her stepfather of sexual abuse (Trial Transcript at 506–07):

| [Trial counsel:] | And was there a time when Erika Valentin made an allegation that your husband, Podgie Acevedo — I think his real name is Florentino, right? |
| --- | --- |
| [Mother:] | Right. |
| [Trial counsel:] | That he had molested her? |
| [Mother:] | Yes, she said that one time. |
| [Trial counsel:] | And now, after she made that allegation, did she go to your aunt's house and live with your aunt for a while? |
| [Mother:] | Yes. |
| [Trial counsel:] | I'm sorry, her aunt. |
| [Mother:] | They put her in her aunt's house. |

25

[Trial counsel:] And was there a time when you went over there to the aunt's house to talk to the aunt, to talk to Erika?

[Mother:] Yes, I did.

[Trial counsel:] And how long after the allegations against Podgie did you go talk to Erika at the aunt's house?

[Mother:] I can't remember exact[ly] what date, but I used to go there almost every day.

[Trial counsel:] Okay. But this was after the allegations you went to the aunt's house to talk to Erika?

[Mother:] Right.

[Trial counsel:] Could you tell the court in your own words, did you and Erika talk about the allegations against Podgie?

[Mother:] Yes, we did.

[Trial counsel:] Can you tell the court what she said about her allegations against Podgie, molesting her?

[Mother:] Well, she said to me that it wasn't true.

[Trial counsel:] And other than that, did she say anything else that you remember that day?

[Mother:] Not that I remember.

[Trial counsel:] Did she tell you why she lied?

[Mother:] No, but I always kept telling her, do not lie.

26

| [Trial counsel:] | But you do remember at the aunt's house, her telling you that the allegations against Podgie were not true? |
|---|---|
| [Mother:] | Right. Right. |
| [Trial counsel:] | And after that, did she move — did Podgie move back into your house? |
| [Mother:] | Yes, he did. |
| [Trial counsel:] | And did she move back into your house? |
| [Mother:] | She moved in with us, yes. |

The U.S. Supreme Court "has never held that the Confrontation Clause entitles a criminal defendant to introduce *extrinsic evidence* for impeachment purposes." *Nevada v. Jackson*, 569 U.S. 505, 512 (2013) (citing *Delaware v. Fensterer*, 474 U.S. 15, 22 (1985)) (italics in original). "[T]he Confrontation Clause is generally satisfied when the defense is given a full and fair opportunity to probe and expose these infirmities through cross-examination, thereby calling to the attention of the factfinder the reasons for giving scant weight to the witness's testimony." *Fensterer*, 474 U.S. at 22. Consequently, the state court did not unreasonably deny Torres's claim based on the exclusion of the testimony by Valentin's mother offered for impeachment. 28 U.S.C. § 2254(d)(1). *Jackson*, 569 U.S. at 511–12.

Also, trial counsel did not seek to introduce the testimony of Valentin's mother to impeach Valentin's testimony about Torres. Trial counsel sought to introduce the testimony of Valentin's mother to impeach Valentine's testimony about her

stepfather. Because trial counsel sought to introduce the testimony of Valentin's mother to impeach Valentin's "general credibility" and did not seek to introduce the testimony to impeach her credibility on the relevant accusation against Torres, the trial judge's ruling did not violate the Confrontation Clause. *Boggs v. Collins*, 226 F.3d 728, 740 (6th Cir. 2000) ("No matter how central an accuser's credibility is to a case —indeed, her credibility will almost always be the cornerstone of a rape or sexual assault case, even if there is physical evidence — the Constitution does not *require* that a defendant be given the opportunity to wage a general attack on credibility by pointing to individual instances of past conduct.") (italics in original); *United States v. Bartlett*, 856 F.2d 1071, 1089 (8th Cir. 1988) ("[T]he evidence of the alleged prior false accusation of rape was offered solely to attack the general credibility of Janis. In addition, we agree with the district court that its probity in that regard is very weak. Accordingly, we hold that the district court properly refused to admit the evidence.").

"Whether [a Confrontation Clause] error [is] harmless may depend on, among other things, 'the importance of the witness's testimony in the prosecution's case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, the extent of cross-examination otherwise permitted, and, of course, the overall strength of the prosecution's case.'" *Al-Amin*, 932 F.3d at 1302 (quoting *Van Arsdall*, 475 U.S. at 684). The petitioner must demonstrate that any error substantially and injuriously

28

affected the jury's verdict. *Al-Amin*, 932 F.3d at 1298–99, 1302 (citing *Brecht v. Abrahamson*, 507 U.S. 619, 623 (1993)).

Even without the testimony by Valentin's mother that Valentin admitted that her accusation against her stepfather was false, trial counsel critically impeached Valentin about the accusation. On cross-examination, Valentin admitted that she and her daughter moved in with her mother and her stepfather after the accusation and that her mother married her stepfather after the accusation. (Trial Transcript at 417–18) Also, the jury learned that her accusation against at least one of her brothers resulted in a conviction, while her accusation against her stepfather did not. (*Id.* at 385–86) Consequently, the jury learned compelling reasons why Valentin's accusation against her stepfather was false.

Trial counsel also critically impeached Valentin about her accusation against Torres. Valentin testified that at the time of trial she was twenty-six. (Trial Transcript at 388) She testified that Torres sexually abused her when she was in ninth or tenth grade. (*Id.* at 388) She admitted that she did not disclose her accusation against Torres immediately after the abuse occurred, even though she had immediately disclosed her accusations against her other brothers. (*Id.* at 386, 389, 395) She further admitted that she did not disclose her accusation against Torres when she first spoke with a law enforcement officer about the accusations by C.L.H., C.M.T., and C.P.H. (*Id.* at 395–96) She testified that she first disclosed her accusation against Torres only when Torres's criminal case progressed. (Trial Transcript at 395–96) She further admitted that she and her daughter returned to live with Torres after the alleged sexual abuse

29

by Torres occurred. (*Id.* at 393–94) Consequently, Torres cannot demonstrate that the exclusion of the testimony by Valentin's mother as impeachment evidence substantially and injuriously affected the jury's verdict. *Al-Amin*, 932 F.3d at 1298–99, 1302 (citing *Brecht*, 507 U.S. at 623).

The Confrontation Clause claim and Ground One are **DENIED**.

**Ground Two**

Torres asserts that the trial judge violated his federal right to due process by admitting testimony by the pediatric nurse practitioner that the absence of any physical abnormalities to the victims' vaginas was consistent with the allegations of sexual abuse. (Doc. 1 at 8–9)

The Respondent asserts that the claim is procedurally barred because Torres failed to fairly present the federal claim in his brief on direct appeal. (Doc. 10 at 13–14) In his brief on direct appeal, Torres raised a similar issue. (Respondent's Exhibit 3 at 40–43) However, Torres cited only state court opinions and state rules of evidence and argued that the trial judge abused her discretion by admitting the evidence. (Respondent's Exhibit 3 at 40–43) Consequently, Torres failed to alert the state appellate court to the federal nature of his claim. *Duncan v. Henry*, 513 U.S. 364, 366 (1995) ("If a habeas petitioner wishes to claim that an evidentiary ruling at a state court trial denied him the due process of law guaranteed by the Fourteenth Amendment, he must say so, not only in federal court, but in state court.").

Because Torres failed to both identify the legal standard for a federal due process claim and apply that legal standard to the facts of his case, Torres failed to

30

fairly present a federal due process claim. *McNair v. Campbell*, 416 F.3d 1291, 1303 (11th Cir. 2005) ("We therefore hold that '[t]he exhaustion doctrine requires a habeas applicant to do more than scatter some makeshift needles in the haystack of the state court record.'") (citation omitted); *Kelley v. Sec'y, Dep't Corrs.*, 377 F.3d 1317, 1344–45 (11th Cir. 2004) ("We simply require that petitioners present their claims to the state courts such that the reasonable reader would understand each claim's particular legal basis and specific factual foundation.").

If Torres returned to state court to fairly present the claim, the post-conviction court would deny the claim as procedurally defaulted. Fla. R. Crim. P. 3.850(c) ("This rule does not authorize relief based on grounds that could have or should have been raised at trial and, if properly preserved, on direct appeal of the judgment and sentence."). Consequently, the claim is procedurally defaulted in federal court. *Snowden*, 135 F.3d at 736. Because Torres fails to demonstrate that either cause and prejudice or a manifest injustice based on actual innocence excuses the procedural default, the claim is procedurally barred from federal review. *Maples*, 565 U.S. at 280; *House*, 547 U.S. at 536–37.

Ground Two is **DISMISSED** as procedurally barred.

**Ground Three**

Torres asserts that trial counsel deficiently performed by moving to consolidate the charges for sexual battery and lewd and lascivious molestation against the three victims. (Doc. 1 at 10–11) He contends that, before trial counsel

filed a motion to consolidate, the trial judge had severed the charges. (Doc. 1 at 10–11)

The post-conviction court denied the claim as follows (Respondent's Exhibit 8 at 2–3) (state court record citations omitted):

> The Defendant alleges that trial counsel was ineffective for moving to consolidate the six counts in the information, which had been severed previously. The Defendant contends that he was prejudiced by counsel's motion because it permitted "an unnecessary accumulation of evidence relating to the similar crimes charged in the information."
>
> This claim lacks merit and is refuted in the record. At a hearing on May 26, 2009, defense counsel explained why he had filed a motion to consolidate the charges. When the charges were initially severed on November 5, 2008, the State indicated that they would file a *Williams* rule notice. The State filed the notice, and the court granted the State's request. Therefore, the testimony of all of the victims would be heard by the jury despite the severance of the charges. Consequently, the severance would no longer help the Defendant and would only further traumatize the victims by forcing them to testify three times. Because the testimony of all of the victims would have been considered by the jury regardless of the motion to consolidate, counsel was not deficient for filing the motion to consolidate. The court finds therefore that counsel was not ineffective, and the Defendant was not prejudiced.

Before trial, trial counsel filed a motion to sever charges against each victim arguing that the charges were not related. (Respondent's Exhibit 1 at 59–60) At a hearing on the motion to sever, the prosecutor advised that he would file a notice of intent to introduce testimony by the victims as similar fact evidence in each severed trial. (Respondent's Exhibit 8, Attachment C at 5–6) The trial judge granted the

32

motion to sever and advised that she would need to hear testimony by the victims before ruling on an objection to the introduction of the testimony. (Respondent's Exhibit 1 at 66 and Exhibit 8, Attachment C at 8, 13)

After an evidentiary hearing, the trial judge overruled an objection to the introduction of the testimony. (Respondent's Exhibit 1 at 67) After the trial judge's ruling, trial counsel filed a motion to consolidate the trials. (Respondent's Exhibit 1 at 68) At a hearing on the motion to consolidate, trial counsel explained that, without consolidation, each victim would testify at each of the three severed trials. (Respondent's Exhibit 8, Attachment B at 3–4)

Because Torres failed to demonstrate that no reasonable counsel would have filed a motion to consolidate after learning that the prosecutor would introduce testimony by the victims as similar fact evidence at each severed trial, the post-conviction court did not unreasonably deny the claim. *Strickland*, 466 U.S. at 690 ("[S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable."); *Chandler v. United States*, 218 F.3d 1305, 1315 (11th Cir. 2000) ("[B]ecause counsel's conduct is presumed reasonable, for a petitioner to show that the conduct was unreasonable, a petitioner must establish that no competent counsel would have taken the action that his counsel did take.").

Ground Three is **DENIED**.

33

**Ground Four**

Torres asserts that trial counsel deficiently performed by not moving to admit a petition for a domestic violence injunction filed by his girlfriend to demonstrate her motive for disclosing the accusations of sexual abuse to police. (Doc. 1 at 12–13)

The post-conviction court denied the claim as follows (Respondent's Exhibit 8 at 3–4) (state court record citations omitted):

> The Defendant asserts that counsel was ineffective for failing to file a motion for the court to take judicial notice of the domestic violence injunction filed against the Defendant in December 2005. The Defendant alleges that he was prejudiced by the lack of this evidence at trial because it was "crucial to proving the theory of fabrication and motive behind the allegations of sexual abuse."
>
> This claim lacks merit and is clearly refuted in the record. The court agrees with the State that defense counsel was not deficient for failing to request that the court take judicial notice of the injunction. Counsel specifically stated that he did not want the contents of the allegations in the domestic violence petition to go to the jury. Counsel acknowledged that there were allegations of previous abuse written in the injunction paperwork and he did not want the jury to see those *Williams* rule claims. Therefore, it is apparent from the record that the decision not to request that the injunction paperwork be submitted to the jury was a strategic decision by counsel. *See Spencer v. State*, 842 So. 2d 52, 62 (Fla. 2003) ("This Court has held that defense counsel's strategic choices do not constitute deficient conduct if alternative courses of action have been considered and rejected."); *Gordon v. State*, 863 So. 2d 1215, 1222 (Fla. 2003) ("Counsel's strategic decisions will not be second-guessed on collateral attack.") (quoting *Johnson v. State*, 769 So. 2d 990, 1001 (Fla. 2000)).
>
> Additionally, the Defendant was not prejudiced by the absence of this evidence for several reasons. First, some of the information about the injunction was elicited in front

of the jury through Carlinda Henderson and Deputy Michael Chittum. Second, defense counsel elicited testimony about other motives for fabrication through the Defendant. The Defendant testified that the victims' mother became angry at the Defendant when she discovered that he had a girlfriend. Defense counsel even outlined through questioning of the Defendant, that the victims' mother had been told about the abuse but took no action against the Defendant until after she found out about the Defendant's girlfriend. Defense counsel then argued in closing that the abuse was reported to the police because the relationship between the Defendant and the victims' mother was deteriorating, they were seeing other people, and the mother wanted the house and the children. Counsel successfully put forth a substitute argument for the mothers' motivation to call the police. However, the jury believed the victims' testimony.

Based on the above reasons, the court finds that the Defendant has failed to demonstrate either deficient performance of counsel or prejudice. Therefore, this claim is denied.

Torres failed to submit a copy of the petition for a domestic violence injunction with his motion for post-conviction relief. (Respondent's Exhibit 7 at 7–10) Because speculation about what new evidence would prove is insufficient to demonstrate prejudice under *Strickland*, the claim is meritless. *Brownlee v. Haley*, 306 F.3d 1043, 1060 (11th Cir. 2002) (quoting *Aldrich v. Wainwright*, 777 F.2d 630, 636 (11th Cir. 1985)).

During trial, trial counsel advised that he intended to introduce testimony by Torres that, before disclosing the accusations of sexual abuse to police, his girlfriend filed a petition for a domestic violence injunction against him and that a judge dismissed the petition. (Trial Transcript at 487–88) The prosecutor argued that

Torres's testimony was hearsay, that the petition also contained inadmissible hearsay, and that trial counsel failed to timely request judicial notice of the petition. (*Id.* at 483–84, 488–89, 492–94)

Trial counsel argued that he did not want to introduce into evidence a copy of the petition because the petition contained prejudicial and irrelevant accusations against Torres (Trial Transcript at 494–95):

> [Trial counsel:] Judge, I don't want judicial notice. I don't want to have all that junk in that petition that Linda Henderson doesn't even testify to against my client on a petition that was dismissed. I don't want the jury to take back into the jury room all of this *Williams* rule evidence that we're not even here on.
>
> Domestic violence, you know, he did this to her, they did that, it was dismissed. The jury doesn't have to know. All the jury needs to know is she filed the injunction, he came to court, it was dropped. It's not for the truth of the matter, it's to show motive and bias. . . .

Because Torres failed to demonstrate that no reasonable counsel would have refused to introduce into evidence a copy of the petition, the post-conviction court did not unreasonably deny the claim. *Strickland*, 466 U.S. at 690. *Chandler*, 218 F.3d at 1315.

Also, a detective testified that, during an interview, Torres's girlfriend told him about an injunction filed "between [her] and [Torres]." (Trial Transcript at 423) Torres testified that his girlfriend became angry because she discovered that he was dating another female. (*Id.* at 528–29, 532) He testified that, after he caught his

girlfriend dating his boss, his girlfriend reported the accusations of sexual abuse to police. (*Id.* at 528, 531, 534) Also, he testified that his relationship with his girlfriend further deteriorated when he started working as a commercial truck driver. (*Id.* at 552–53) He testified that, when he was away from home for work, he accused his girlfriend of cheating, and she accused him of cheating. (*Id.* at 553–54) He testified that Valentin, his sister, moved in with his girlfriend, after he moved out. (*Id.* at 564) During closing, trial counsel argued that Torres's girlfriend reported the accusations of sexual abuse to police because she and Torres constantly argued, because she discovered his affair with the other female, and because he discovered her affair with his boss. (*Id.* at 655)

Even without the admission of a copy of the petition for a domestic violence injunction, trial counsel demonstrated that Torres's girlfriend had a motive to fabricate the accusations of sexual abuse against Torres. Because Torres cannot demonstrate a reasonable probability that the outcome at trial would change if trial counsel had introduced a copy of the petition, the post-conviction court did not unreasonably deny the claim. *Guardado v. Sec'y, Fla. Dep't Corrs.*, 112 F.4th 958, 984 (11th Cir. 2024) ("[N]o prejudice can result from the exclusion of cumulative evidence. [E]vidence presented in postconviction proceedings is cumulative or largely cumulative to . . . that presented at trial when it tells a more detailed version of the same story . . . [,] provides more or better examples[,] or amplifies the themes presented to the jury.") (citations and internal quotations omitted).

Ground Four is **DENIED**.

**Ground Five**

Torres asserts that trial counsel deficiently performed by not presenting testimony by the judge who presided over the hearing on the petition for a domestic violence injunction to testify about the claims in the petition and the reasons that the petition was dismissed. (Doc. 1 at 14–15)

The post-conviction court denied the claim as follows (Respondent's Exhibit 8 at 5–6) (state court record citations omitted):

> The Defendant alleges that trial counsel was ineffective for failing to call Judge Linda Babb as a witness to testify regarding the domestic violence injunction filed against the Defendant in December 2005. Specifically, the Defendant claims that counsel should have called Judge Babb to testify "why the injunction was filed, the context of the injunction, and the reasons that she dismissed it . . . ." Defendant alleges if defense counsel called Judge Babb, "the chances are very good" that the outcome of the trial would have been different.
>
> First, this claim is [ ] speculative. The court cannot grant post-conviction relief on pure speculation. Further, if a claim is legally insufficient, this court normally allows the Defendant an opportunity to amend the claim to state a legally sufficient claim for relief under Rule 3.850. However, in the instant case, it would be futile to permit the Defendant an opportunity to attempt to amend this claim. This claim lacks merit and is clearly refuted in the record. As stated above, defense counsel was not deficient for failing to request that the court take judicial notice of the domestic violence injunction. Similarly, counsel was not deficient for failing to call Judge Babb as a witness to testify regarding the issuance and dismissal of the injunction. Counsel specifically stated that he did not want the contents of the allegations in the domestic violence petition to go to the jury. Counsel acknowledged that there were allegations of previous abuse written in the injunction paperwork and he did not want the jury to see those

38

*Williams* rule claims. Therefore, it is apparent from the record that the decision not to request that the injunction paperwork be submitted to the jury was a strategic decision by counsel. *See Spencer v. State*, 842 So. 2d 52, 62 (Fla. 2003) ("This Court has held that defense counsel's strategic choices do not constitute deficient conduct if alternative courses of action have been considered and rejected."); *Gordon v. State*, 863 So. 2d 1215, 1222 (Fla. 2003) ("Counsel's strategic decisions will not be second-guessed on collateral attack.") (quoting *Johnson v. State*, 769 So. 2d 990, 1001 (Fla. 2000)).

Further, the court again finds [ ] that the Defendant has failed to establish that he was prejudiced by the absence of this evidence. Based on all of the above reasons, the court finds that the Defendant has failed to demonstrate either deficient performance of counsel or prejudice. Therefore, this claim is denied.

Torres failed to present an affidavit or other testimony by the judge who presided over the hearing on the petition for a domestic violence injunction to demonstrate that she would have testified in the manner that he contended. Because Torres speculates about the proposed testimony by the judge, the claim is meritless. *McKiver v. Sec'y, Fla. Dep't Corrs.*, 991 F.3d 1357, 1365 (11th Cir. 2021) ("We have explained that this burden is particularly 'heavy where the petitioner alleges ineffective assistance in failing to call a witness because often allegations of what a witness would have testified to are largely speculative.'") (quoting *Sullivan v. DeLoach*, 459 F.3d 1097, 1109 (11th Cir. 2006)).

Also, for the reasons explained above why trial counsel did not deficiently perform by not introducing into evidence a copy of the petition for a domestic violence injunction, trial counsel did not deficiently perform by not calling the judge

39

to testify about the contents of the petition and the reasons why the petition was dismissed. Consequently, the post-conviction court did not unreasonably deny the claim.

Ground Five is **DENIED**.

**Ground Six**

Torres asserts that trial counsel deficiently performed by not objecting to the prosecutor's failure to disclose in discovery a police report and three statements by the victims. (Doc. 1 at 16–17)

The post-conviction court denied the claim as follows (Respondent's Exhibit 8 at 6–8) (state court record citations omitted):

> The Defendant contends that counsel failed to file a motion for a *Richardson*[1] hearing after the State allegedly committed discovery violations. Specifically, the Defendant argues that the State failed to disclose Deputy Michael Chittum's police report and witness statements from the three victims. The Defendant contends that had trial counsel done so, the outcome of the trial would have been different because counsel "could have possibly impeached the witnesses or at the very least created a shadow of doubt in the jury's mind."
>
> [1] *Richardson v. State*, 246 So. 2d 771 (Fla. 1971).
>
> The Defendant's claim is speculative, without merit, and directly refuted by the record. Initially, the court observes that the State informed counsel of its possession of witness statements and police reports when it filed an Answer to Demand for Discovery on February 2, 2007. The discovery was sent to defense counsel.
>
> Moreover, it is clear that counsel was aware of the existence of the police report and witness statements on

40

August 29, 2007, when he deposed Deputy Chittum. Deputy Chittum specifically referenced his report and the witness statements made to him throughout the deposition. Consequently, as counsel would have been aware of the report and statements over five years before the Defendant's trial, a discovery violation could not have occurred, and counsel would have had no valid grounds to move for a *Richardson* hearing. Again, counsel cannot be deemed ineffective for failing to file a meritless motion. *See Teffeteller v. Dugger*, 734 So. 2d 1009, 1020 (Fla. 1999); *Williams v. State*, 987 So. 2d 1, 10 (Fla. 2008).

Additionally, the Defendant has not shown how he was prejudiced by counsel's failure to move for a *Richardson* hearing. Assuming without deciding that a *Richardson* violation occurred, the Defendant has not shown that a discovery violation would have prejudiced him.

When a discovery violation has occurred, the court must determine "whether there is a reasonable possibility that the discovery violation procedurally prejudiced the defense . . . [in] that the defendant's trial preparation or strategy would have been materially different had the violation not occurred . . . [in other words, the information] reasonably could have benefited the defendant." *Giles v. State*, 916 So. 2d 55, 58 (Fla. 2d DCA 2005) (quoting *State v. Schopp*, 653 So. 2d 1016, 1020 (Fla. 1995)). Moreover, "the harmless error standard in *Schopp* does not focus on the discovery violation's effect on the verdict . . . [but on] whether there is a reasonable possibility that the discovery violation materially hindered the defendant's trial preparation or strategy." *Muniz v. State*, 988 So. 2d 1194, 1197 (Fla. 2d DCA 2008) (internal quotations omitted).

In this case, the record shows that State informed Defendant and his counsel that Deputy Chittum interviewed the victims and prepared a report. This fact is further evidenced by counsel's subsequent deposition of the deputy and of all the victims. Additionally, the Defendant has not alleged what information was contained in a police report or witness statements that was different from the deposition testimony of the witnesses. Because Defendant deposed these witnesses, the

> Defendant has not shown that if counsel did not have the police report and the witness statements, how his defense at trial would have been "materially different" from the defense presented.
>
> Additionally, Defendant has not shown that, had his counsel requested a *Richardson* hearing, the court would have excluded the testimony of Deputy Chittum or the victims. Consequently, the court does not find that the Defendant has proven that his counsel's failure to move for a *Richardson* hearing, even if grounds existed for the hearing, in any way prejudiced him. [The claim] does not entitle the Defendant to relief.

Torres failed to attach to his motion for post-conviction relief a copy of Deputy Chittum's report and the statements by C.L.H., C.M.T., and C.P.H. that he contends that the prosecutor failed to disclose. (Respondent's Exhibit 7) Because speculation about the contents of the report and the statements is insufficient to demonstrate prejudice under *Strickland*, Torres's claim is meritless. *Brownlee*, 306 F.3d at 1060 (quoting *Aldrich*, 777 F.2d at 636).

Before trial, the prosecutor disclosed to Torres a discovery notice that identified Deputy Chittum, C.L.H., C.M.T., and C.P.H. as witnesses who had knowledge relevant to the offenses charged. (Respondent's Exhibit 8, Attachment E at 1–2) The notice advised that statements by the witnesses were available for inspection and copying at the prosecutor's office. (Respondent's Exhibit 8, Attachment E at 1–2)

Rule 3.220(b)(1), Florida Rules of Criminal Procedure, requires a prosecutor to "disclose to the defendant and permit the defendant to inspect, copy, test, and photograph . . . a list of the names and addresses of all persons known to the

prosecutor to have information that may be relevant to any offense charged or any defense [and] the statement of any person whose name is furnished in compliance with the [rule]." To comply with Rule 3.220(b), a prosecutor does not have to provide a defendant a physical copy of a statement and instead may inform a defendant that the statement is available for inspection and copying. *Durrance v. State*, 44 So. 3d 217, 221 (Fla. 4th DCA 2010). Consequently, the prosecutor complied with Rule 3.220 by identifying Deputy Chittum, C.L.H., C.M.T., and C.P.H. as witnesses who had knowledge relevant to the offenses charged and by advising that statements by the witnesses were available for inspection and copying at the prosecutor's office. *State v. Williams*, 678 So. 2d 1356, 1357–58 & 1358 n.1 (Fla. 3d DCA 1996).

Before trial, trial counsel deposed Deputy Chittum, C.L.H., C.M.T., and C.P.H. (Respondent's Exhibit 8, Attachments G and H) During his deposition, Deputy Chittum testified about his interviews of C.L.H., C.M.T., and C.P.H. and repeatedly referred to his report to refresh his recollection. (Respondent's Exhibit 8, Attachment G at 4–5, 8, 10, 11–14, 17) During a pretrial evidentiary hearing, trial counsel examined C.L.H., C.M.T., and C.P.H., and asked C.P.H. and C.M.T. about their statements to police officers. (Respondent's Exhibit 1 at 102, 119–20) During trial, trial counsel impeached C.L.H. with her deposition testimony (Trial Transcript at 272–79) and impeached C.P.H. and C.M.T. with their statements to a detective and to a pediatric nurse practitioner. (*Id.* at 312–14, 338–39)

Because the record demonstrates that trial counsel knew about Deputy Chittum's report and thoroughly impeached C.L.H., C.M.T., and C.P.H. with prior

statements, Torres failed to demonstrate how any failure to disclose the detective's report and the witnesses' statements "'materially hindered [his] trial preparation or strategy.'" *Smith v. State*, 7 So. 3d 473, 503 (Fla. 2009) (quoting *Scipio v. State*, 928 So. 2d 1138, 1150 (Fla. 2006)). *State v. Schopp*, 653 So. 2d 1016, 1020 (Fla. 1995) ("In determining whether a *Richardson* violation is harmless, the appellate court must consider whether . . . there is a reasonable possibility that the defendant's trial preparation or strategy would have been materially different had the violation not occurred."). Because a motion for a discovery violation would not have succeeded, trial counsel did not deficiently perform. *Pinkney v. Sec'y, Dep't Corrs.*, 876 F.3d 1290, 1297 (11th Cir. 2017) ("[A]n attorney will not be held to have performed deficiently for failing to perform a futile act, one that would not have gotten his client any relief.").

Lastly, Torres speculates that Deputy Chittum's report would have demonstrated that his girlfriend disclosed the accusations to police a few hours after the judge dismissed the petition for a domestic violence injunction. (Doc. 1 at 17) He further speculates that trial counsel could have used the prior statements by the victims to impeach the victim's testimony at trial. (Doc. 1 at 17) Because Torres failed to submit a copy of Deputy Chittum's report and the statements by C.L.H., C.M.T., and C.P.H., he cannot demonstrate a reasonable probability that the outcome at trial would change if trial counsel had timely received the documents. *Strickland*, 466 U.S. at 694; *Aldrich*, 777 F.2d at 636.

44

Ground Six is **DENIED**.

**Ground Seven**

Torres asserts that the trial judge violated his federal right to confrontation by prohibiting trial counsel from cross-examining C.L.H. about her sexual activity with an adult male while she was a minor and about her two pregnancies with the adult male. (Doc. 1 at 18–19)

Before trial, the prosecutor filed a motion to exclude the evidence about C.L.H.'s sexual activity with an adult male while she was a minor, and the trial judge granted the motion as follows (Trial Transcript at 16–19):

| | |
|---|---|
| [Prosecutor:] | Yes, Judge. What I want to preclude the defense from going into on cross-examination is, you know, isn't it a fact that you have had a child or children since the last alleged incident? It's not relevant. It doesn't have anything to do with this trial. The only reason why he would elicit such a response is, obviously, to somehow discredit the victim, so to speak, or to shed a different light on her in the jury's eyes, Judge. So, I would ask that you — I would respectfully ask that you grant my motion in limine and preclude that. I think there is no relevancy to it. |
| [Judge:] | Mr. Vizcarra? |
| [Trial counsel:] | Judge, my client would like to possibly testify — if he does testify, he wants to go into the fact that she is pregnant and had two children by a much older gentleman. He could advise the court of what — well, that's what he would like to testify to, Judge. And the thing |

45

is, too, I think she was at [the] age of fourteen, she —

. . .

Judge, my client, Mr. Torres, is prepared, if he chooses to testify, that she had entered into a relationship with someone that is over thirty years old and her being a minor child and has, in fact, had two children while she was underage. And he feels that is something that leads to the knowledge. It shows the knowledge that she would have as far as sexual things and those items. And he's afraid that if he's not allowed to bring that up that they may — that the jurors may feel that she gained that knowledge from having relations with him. And, in fact, she's been sexually promiscuous with another older gentleman and has since left the house.

[Prosecutor:]   Judge, this flies in the face of the Rape Shield statutes. And the only reason why they would be wanting to introduce this testimony or this evidence in front of the jury is to somehow put her in a bad light in front of the jury to say that she's promiscuous or whatever at whatever age, fifteen or sixteen, that she had a relationship with this older gentleman, and since then she's had two children. It happened after the allegations, Judge, so what relevancy does it have? It has none.

[Trial counsel:]   And he would just say that he wants you to know that she was pregnant at the time he got arrested. Allegations were made in January, and he got

46

arrested in December, and during that time she got pregnant.

[Torres:]          I was arrested a year later.

[Trial judge:]     All right. Well, for the time being, it sounds like classic Rape Shield material that is inadmissible. And that is — well, it's pretty clear from this point — I'll entertain [a] contemporaneous objection or request for a proffer during testimony, if need be, but at this point from what I'm seeing and what I know of the record and the deposition testimony, that type of testimony would clearly be covered under the Rape Shield law.

During a proffer at trial, Torres testified that, after accusing him of sexual abuse, C.L.H. became pregnant by a male who was thirty-two. (Trial Transcript at 509) He testified that the male fathered two children with C.L.H., when she was a minor. (*Id.* at 509)

As explained earlier in this Order, the U.S. Supreme Court "has never held that the Confrontation Clause entitles a criminal defendant to introduce *extrinsic evidence* for impeachment purposes." *Jackson*, 569 U.S. at 512 (citing *Fensterer*, 474 U.S. at 22) (italics in original). Consequently, the state court did not unreasonably deny the claim by excluding Torres's testimony offered for impeachment. 28 U.S.C. § 2254(d)(1).

Section 794.022(2), Florida Statutes, Florida's Rape Shield law, prohibits the admission of evidence demonstrating specific instances of prior consensual sexual activity between the victim and another person:

47

> Specific instances of prior consensual sexual activity between the victim and any person other than the offender may not be admitted into evidence in a prosecution under Section 787.06, Section 794.011, or Section 800.04. However, such evidence may be admitted if it is first established to the court in a proceeding *in camera* that such evidence may prove that the defendant was not the source of the semen, pregnancy, injury, or disease; or, when consent by the victim is at issue, such evidence may be admitted if it is first established to the court in a proceeding *in camera* that such evidence tends to establish a pattern of conduct or behavior on the part of the victim which is so similar to the conduct or behavior in the case that it is relevant to the issue of consent.

Trial counsel sought to introduce testimony by Torres that, when C.L.H. was thirteen or fourteen, she became pregnant after engaging in sex with another male, who was thirty-two. (Trial Transcript at 17–18, 509) The testimony would have further demonstrated that the male fathered two children with C.L.H., when she was a minor. (*Id.* at 17, 509) A male commits a lewd and lascivious battery by engaging in vaginal sex with a female who is older than twelve and younger than sixteen, and consent is not a defense to the crime. § 800.04(2) and (4)(a), Fla. Stat.

Because Section 794.022(2) bars evidence of "[s]pecific instances of prior consensual sexual activity," and Torres's proffered testimony described specific instances of legally nonconsensual sexual activity, Florida's Rape Shield law did not bar the testimony. *Lydecker v. State*, 390 So. 3d 688, 692–93 (Fla. 2d DCA 2024) (holding that Florida's Rape Shield law did not bar accusations of sexual abuse by a minor female against two adult males because accusations were based on nonconsensual activity). *Gomez v. State*, 245 So. 3d 950, 953 (Fla. 4th DCA 2018)

48

("The appellant sought to introduce the victim's prior allegation against her employer of sexual assault. As the victim did not attribute this to prior consensual conduct, it does not fit within the rape shield law.").

However, even if Florida's Rape Shield law did not bar Torres's testimony, Torres had the burden to demonstrate that his testimony about the sexual activity and pregnancies with the other adult male was relevant. *Thorne v. State*, 271 So. 3d 177, 184 (Fla. 1st DCA 2019) ("Because the proffered evidence was of the victim's allegations of nonconsensual conduct by other men, the Rape Shield did not apply. However, the evidence was subject to the general rules of relevance.") (citation omitted). Likewise, "the Supreme Court has never decided that the Confrontation Clause affords a defendant the right to cross-examine a witness as to irrelevant matters." *Ivy v. Fla. Dep't Corrs.*, 543 F. App'x 923, 928 (11th Cir. 2013).[3] The Confrontation Clause "'only protects cross-examination that is *relevant.*'" *Jones v. Goodwin*, 982 F.2d 464, 469 (11th Cir. 1993) (citation omitted).

Also, as explained earlier in this Order, "[a] trial court retains 'wide latitude insofar as the Confrontation Clause is concerned to impose reasonable limits on such cross-examination based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness's safety, or interrogation that is repetitive or only marginally relevant.'" *Francis v. Dugger*, 908 F.2d 696, 702 (11th Cir. 1990) (quoting *Van Arsdall*, 475 U.S. at 679).

---

[3] 11th Cir. R. 36-2 ("Unpublished opinions are not considered binding precedent, but they may be cited as persuasive authority.").

Trial counsel contended that Torres's testimony about C.L.H.'s pregnancy would demonstrate that C.L.H. did not learn about sexual activity from sexual abuse by Torres and instead learned about sexual activity from the male who impregnated her. (Trial Transcript at 17–18) Evidence of prior knowledge of sexual activity by a minor victim may become relevant to demonstrate fabrication. The evidence becomes relevant if the victim is too young to know about sexual activity and the prosecutor argues that the victim's young age demonstrates that the victim could not have known about the accusations concerning sexual activity unless the accusations were true. *Dixon v. State*, 605 So. 2d 960, 961–62 (Fla. 2d DCA 1992) (reversing because the trial judge excluded relevant evidence that the victim, who was five, had engaged in oral sex with her brother before the accusations against the defendant).

However, Torres's testimony about C.L.H.'s pregnancy was only marginally relevant. C.L.H. was not four or five when she first disclosed the accusations against Torres; she testified that she was fourteen. (Trial Transcript at 262) Evidence of C.L.H.'s pregnancy would demonstrate knowledge of vaginal sex. However, during a proffer, Torres did not testify that C.L.H. became pregnant before she accused him of sexual abuse and instead testified that she became pregnant only after she accused him of sexual abuse (*Id.* at 509):

> [Trial counsel:] Okay. What has happened — well, let me ask you this: Did she get pregnant by another individual shortly after she made these allegations against you?
>
> [Torres:] Yes, sir.

50

| | |
|---|---|
| [Trial counsel:] | You know who that person is? |
| [Torres:] | No, sir. |
| [Trial counsel:] | You know how old he is? |
| [Torres:] | Thirty-two years old when she first got pregnant with the first kid. |
| [Trial counsel:] | How many children does she have now? |
| [Torres:] | Right now, she's got two. |
| [Trial counsel:] | Okay. And this is all after these allegations came out against you? |
| [Torres:] | Yes, sir. |

Lastly, during closing, the prosecutor did not as the jury to accept C.L.H.'s statements on grounds that C.L.H. could not have known about sexual activity when she disclosed the sexual abuse unless the accusations were true. Consequently, the exclusion of Torres's testimony about C.L.H.'s pregnancy did not prevent Torres from rebutting any such argument.

Because Torres's testimony about C.L.H.'s pregnancy was only marginally relevant at trial, the trial judge did not violate his federal right to confrontation by excluding the testimony. For the same reasons, Torres fails to demonstrate that the state court's exclusion of Torres's testimony substantially and injuriously affected the jury's verdict. *De Lisi v. Crosby*, 402 F.3d 1294, 1301–02 (11th Cir. 2005) (citing *Brecht*, 507 U.S. at 629).

Ground Seven is **DENIED**.

Accordingly, Torres's petition (Doc. 1) for a writ of habeas corpus is **DENIED**. The Clerk is **DIRECTED** to enter a judgment against Torres and **CLOSE** this case.

**DENIAL OF CERTIFICATE OF APPEALABILITY AND
LEAVE TO PROCEED *IN FORMA PAUPERIS***

Because Torres neither makes a substantial showing of the denial of a constitutional right nor demonstrates that reasonable jurists would find debatable both the merits of the underlying claims and the procedural issues that he seeks to raise, a certificate of appealability and leave to appeal *in forma pauperis* are **DENIED**. 28 U.S.C. § 2253(c)(2). *Slack v. McDaniel*, 529 U.S. 473, 478 (2000).

**DONE AND ORDERED** in Tampa, Florida on February 18, 2026.

_____
MARY S. SCRIVEN
UNITED STATES DISTRICT JUDGE